The first case on our call this afternoon is 5-18-0542 Cahokia School District. I hope I have the right case. Are you ready? Good afternoon. In the place of the court, my name is Tom Gage. I'm the counsel on behalf of 20 Illinois school districts, most from this area, including Staunton and Bond County and Carlinsville, the superintendents of which are here in the courtroom today. And we're here in the courtroom today because the state of Illinois, since the time of the decision in Committee for Educational Rights v. Edgar in 1996, which held that Article 10 of the Illinois Constitution provided for a high-quality education, and that was mandatory in the abstract, but there was no definition of it. Since that time, we have moved into the century of No Child Left Behind, of the Common Core Standards, of examinations aligned to the Common Core Standards, of detailed assessments of individual students annually, with the assessments placed in their record under the so-called Partnership for Accountability for Assessment for Readiness for College and Careers, the PARC exams, an acronym I always stumble over. And we have now a mountain of statutory and administrative material that defines in detail what students must know and what skills they must demonstrate at every grade level that requires their assessments under state law. But those assessments are used to determine the life chances of these children, including whether they go on to secondary or post-secondary education institutions, college and other institutions, funded by the taxpayers of this state. There is now a detailed assessment of what is a high-quality education, and that is not plaintiff's characterization. It is the characterization of the Illinois General Assembly, which in the 2017 Education Act, the Evidence-Based Funding for Student Success Act, made at least four specific references, textual references, to this high-quality education being a constitutional entitlement of the students of this state. If you go back and look at that statute, whoever drafted it was effectively, and it's hard to deny it, is effectively addressing specifically the Edgar decision, and specifically addressing and making reference to the fact that the achievement of these learning standards, of these common core standards, is a constitutional right of the children of this state. This mountain of statutory and administrative material is there. It's a fact. The learning standards run to hundreds of pages. The part assessments that take place every year have compiled a huge record in the dossier of every student in this state as to whether or not they're meeting the state standards and what's going to happen to them. Our contention here is not just that there is an entitlement to a high-quality education that has been defined in detail, just as Edgar described it ought to be. I have a question about the pleadings. Yes. Your brief says that the First Amendment complaint requested that the state submit a schedule of additional payments and asked that funds be set aside to meet that schedule, and requested that the court order a modification of the parks standards or exams. The circuit court says that that relief is being sought in paragraph 12 of its order. I don't see that relief requested in the First Amendment complaint from May 21st, 2018, and I don't see any further amended complaints alleging that. Can you explain that? I can't explain it. I can say only that what we are seeking is a declaratory judgment that the state is now, with the current level of funding, just as it was stated in the 2017 Act implicitly, depriving the students of the state of their rights under Article 10. We also say that it's depriving them of their rights to equal protection. We did ask for an order directing the governor to submit a plan that would meet the goal that's set out in the 2017 Act of limiting this constitutional violation and bringing the students up to full funding by 2027. We recognize and disavow any interest in getting an order from this court to require an appropriation of funds or setting aside of funds, and to that extent, if the complaint says that, it's a little inartful. What we're interested in is the governor coming forward with a plan for the budgets that the governor is going to submit. We recognize that there's a big hurdle in getting the legislature, getting the judicial order to have the legislature actually appropriate the money. But under the Declaratory Judgment Act, we're entitled to a binding resolution of our constitutional and statutory rights, whether or not consequential relief is or can be sought. I'm literally quoting the statute. And in addition to that, we think it is appropriate, given that the governor has a statutory duty to submit a budget, to come forward in his capacity of submitting those budgets and not act to frustrate the achievement of this legislative goal. Tell us how he's going to do it. Following up on that, why are not the claims against the state itself properly dismissed under the Doctrine of Sovereign Immunity? Well, the latest clarification of how that doctrine applies is in Leach-a-Root. And Leach-a-Root literally says that suits for prospective injunctive relief can be brought against the state, literally says the state, state officers and others. And we are not seeking to get any order that is – and I understand that it's a little ambiguous with respect to paragraph B of the prayer for relief. But believe me, we did not intend to say that we were asking for a legal judgment for $7.2 billion. We are asking for a declaratory judgment, first of all, that we're entitled to that per the 2017 Act. But in addition to that, we're asking for prospective injunctive relief. We're asking for the governor to come forward with a plan to remedy this just in time to meet the 2027 deadline. And that's prospective injunctive relief against the state and state officers. And I would point out to the Court that in Edgar, Citizens for Educational Rights v. Edgar, the defendants in that case were Governor Edgar and the State Board of Education, as well as the state superintendent. So the state was sued in Edgar, or at least the State Board of Education. And there is no constitutional bar to a suit against the state. And if this Court were to decide that the state is not an appropriate defendant, that would still be fine by us because we think that the governor is an appropriate defendant. Well, how can the governor provide that relief? Well, the governor submits the budget. So what we're asking for is tell us what budgets you're going to be submitting to get us up to the 2027 goal. In other words, we're asking the governor in that capacity of submitting budgets, which is set out in 20 ILCS, 15 ILCS 20-50-5, we're asking the governor, we're asking the Court to require the governor to come forward with a plan for meeting this so that at least, and we have no reason to think so far, that the legislature is going to counterman the governor. The governor has been asking for $350 million a year. We think that it takes about $660 million a year to get up to the level that the State Board of Education, pursuant to the 2017 Act, has determined to be the total that is necessary to give adequate capacity for all the low-wealth districts in the state, including our 20. So here we have an order which says not the specific sum, really, although we're looking at $7.2 billion at the moment, but whatever it is that the State Board of Education determines, pursuant to the 2017 Act, as necessary to meet the constitutional rights of the students. And this is laid out in the Act itself. It's not something we're making up or that the Court has to make up. It's in the Act. There's a constitutional right. Here are the metrics that you have to use to determine adequacy capacity for individual districts. So Staunton has one. It's like $8 million. Bond County has one. It's $6 million. Cahokia has one. It's like $16 million. This is a simple question, but isn't Staunton in the 4th District? Oh, that may be, but we thought Cahokia is in the 5th District. Okay. Just something that popped into my head when you mentioned it. That's in the Coopman County, isn't it? Well, it's one Illinois appellate court. Right. But it certainly is true that these are what, and I admit I'm from Chicago, these are certainly downstate school districts, largely down in the 4th and 5th Districts. It's all safe to you. Just a joke. Now, that was a lie. So what we're seeking is an order that is really kind of plugging into the statutory framework and saying, yes, you do have a right. Now, you may say, well, why are we here before the court? Because the General Assembly has already said it's a constitutional right. Why come to us? Well, it is important. We have a lot of controversy, and it's unfortunate that we have a lot of controversy because the state defendants say there is no such constitutional right. I'm not entirely sure who they're representing because the State Board of Education, and there's no dispute about this, has said absolutely it's a constitutional right and absolutely disparity in funding does not justify frustrating the right of these students to meet the learning standards. So they're not representing the State Board of Education, and they're not representing the General Assembly. They've run the General Assembly under the bus. Their brief says, well, the General Assembly has no business saying what is a constitutional right. Well, I respectfully disagree. But putting that point aside for a second, it's a game of legal musical chairs. You know, the State's argument is, well, the General Assembly can't decide what is a high-quality education for purpose of Article 10. Okay. But the court, because that's strictly a court function. Okay. But the court can't decide what is a high-quality education for purpose of Article 10 because that's the function of the General Assembly. I mean, this is musical chairs. Everybody has to be on the same page, and it makes a huge difference and it terminates a real, live controversy if this Court says, enough, stop the musical chairs, stop playing around with this. This is the definition of a high-quality education. These plaintiffs are not seeking just a high-quality education. They are seeking a right, an entitlement to meet the performance standards of the State which are going to mark those children's lives permanently, permanently, in terms of their eligibility for post-secondary education and everything else. Under equal protection, under Article 10, under any simple notion of justice, and that's why the General Assembly passed 2017 Act, Evidence-Based Funding and Student Success Act. How can you deny these children the right to meet these standards? And that's exactly what the General Assembly has acknowledged, and that's exactly what we're asking the Court to acknowledge. That's our case. Speaking of the students, I have one other question. Sure. And that's about standing. How can the school district have standing to assert the rights of the students? And didn't the students actually, weren't they actually plaintiffs in the Edgar case? Well, there were a few students who were plaintiffs in the Edgar case. That's correct. But if you look at the caption, there are 97 school districts that are plaintiffs, plus there's a committee of parents and whatever who are plaintiffs. So the standing is simply based on, and the defendants cited as their lead case, Greer v. Illinois Housing Authority, where the appellate court said, Look, we're getting rid of zone of interest or who's the right holder. Here's what standing is. Standing is you've been materially injured by a violation of law, by a violation of the Constitution or a violation of statute. In this case, the districts have a duty to educate these children. They have a cognizable legal interest in their best interest. They are literally, by state law, in loco parentis. So if there is widespread failure under these exams, and you can look at the failure rates for low-wealth districts, what does this do to the districts? Well, it causes reputational injury. It causes economic injury because parents say, I'm not going to be in that school district. I'll move into something that has a higher pass rate. But it also frustrates them from doing the job that they are set up to do. So for all those reasons, they do have standing, and Edgar certainly didn't deny any standing to them. But in addition to that standing, and I'm talking about their own interests, and there's a case, Main Board Township versus something, I'm sorry, I'm just blanking on the full caption, but it's in the briefs, where the appellate court recognized that the school districts have a right to sue the state for unfunded mandates with respect to instruction. That's a case that goes some ways back, and these districts have that material injury. But in addition to that, and more importantly perhaps, they are in loco parentis. They have a right to represent these students, and somebody's got to represent them, right? Because they're Mayans. They're five years old. They're seven years old. They can't come to court on their own. Who better to represent them than the school districts, which have a statutory obligation to act as in loco parentis, and to ensure that they have a high-quality education, to ensure that they meet the constitutional or have the capacity to meet their entitlement to pass these performance standards. So both on the basis of direct actual injury and on the basis of their representative capacity of the children, two separate dual capacities, they have standing to bring this action, and they don't have to be the literal right holder for purposes of Article 10, but they have suffered a serious injury. Just look at these failure rates and the consequences for these districts when they can't educate, put these children into post-secondary education institutes as readily as they might be able to if they have the money to do it. So I can't think of anybody else who would be a better representative of these children. And also I do think, from a trial lawyer's point of view, what is the point of bringing in these children as minors and having them deposed, you know, and having pot shots taken at them because, well, maybe it was your fault that you didn't finish your homework the other night. It's just tasteless to bring them in as minors. So there's something in the record to show that dollars spent by the district equals the abilities of the students. So you have a dollar student, do you think that's in the evidence? Do you see that? That's true, and it's part of the legislation. Well, if I understand your question correctly, Your Honor, the more money means that they're going to be better off. Yes. And I need to prove that. And why is that? Because the legislature says so, and here's why. This isn't a case where the legislature, like in the old days, had a foundation level and said, throw money at problems. Throw money at problems. I thought that's what this was. This isn't. OK. So because what this says is, we will throw money at you on a certain condition. You have to use this money for one of 27 educational practices that we the state have deemed to be effective in raising the scores. And you can pick based on your own situation, your demographics, the number of low income, the number of English learners, the regional differences in teacher salaries. You can pick. And you have some cases that show this happened? You have a test case that proved that up? Is that how you did it? There's no test case because no one's ever challenged it. So what happens is that the district, but I want to explain what happens. The district then says, looks at the smorgasbord that the General Assembly says, if you spend it for this, we will give you this extra money. And it comes forward with a plan to the State Board of Education. And the State Board of Education says, OK, this works. And this will be effective. And evidence-based funding for Student Success Act is, I want to emphasize the word evidence, which is in the title of the act and is the premise of the act. See, that's what I was trying to ask you. What is the evidence? Well, the evidence is that there's been research in other states and in Illinois that certain practices have an effect of raising the scores. This is based on academic and expert research and expert testimony. So experts were brought in. Michelle Mangdon is one of them. She's up in Illinois. And this is all originally developed in Wisconsin to replace the Augenblick-Meyers methodology. And the evidence-based funding methodology is what we're going to do is look at what we have an empirical basis for saying works will raise the capacity of the students to pass these examinations. And the legislature took, there were commissions. There's a ton of testimony about this. We didn't put it all on the record. But a ton of testimony about all of this that is the basis for what the general assembly did. But you have a ton that's not on our record. Well, it was in the legislative record. So it's not before the court. That's what I mean. The General Assembly considered it in adopting this evidence-based funding methodology. But we did not take it as our function to prove to the court that the evidence-based funding methodology will work when the General Assembly has made a binding determination that, yes, it will work. And the attorney general has not raised that as an issue in the case. No one disputes that if, and I certainly have not seen this in the attorney general's argument, no one disputes that if these practices are funded at this level, these students will meet the standards. That's not an issue in the case. The issue in the case is that the state says that we have no constitutional obligation to do it, not that it won't work. But Section 2 of Article 10 says that the highest policymaking body of the state on education is not the governor, it's not the General Assembly, it's not this court. It's the State Board of Education. And the State Board of Education has said, this is what works. OK, thank you. You'll have to rebut. OK. Thank you. May I please report? I'm Assistant Attorney General Richard Hussack, counsel for the defendants in this case. And I urge the court to affirm the circuit court's dismissal of this action for three independent reasons. First, there is no proper party, plaintiff or defendant, to support the claims and relief that is sought in this case. Well, let me ask you about that. The counsel for the appellant ably pointed out the responsibility of the governor to propose a budget. Why is that not enough to make him a proper defendant? If what they want is more funding for the schools, the Illinois Supreme Court has made clear in the state slash CMS versus AFSCME case that the power of the purse is exclusively the prerogative of the General Assembly. That's a legislative function. And the case that I argued against my learned colleague recently in front of the first district, the Illinois Collaboration on Youth versus DEMAS case, established that the governor's role in that essentially legislative process is legislative. And the courts cannot control the exercise of that legislative function by the governor, whether it's to require him to propose something in a budget or to prohibit him or require him to veto any legislative matter, especially with respect to the subject matter of appropriations. I think the concession that my colleague made, saying that dropping the state named as such as a defendant isn't a problem for them, and I think the law is clear, that you can't name the state as such as a defendant in any case, whatever relief you're seeking. But it is true that in the Lotaro case, as more carefully explained in the Illinois Supreme Court's subsequent decision in Parmar, that there is a limited exception, the officer's suit exception, that permits a court to enter prospective injunctive relief to prevent an ongoing violation of the Constitution or a statute. But that doesn't permit the courts to order state spending, except in very limited circumstances, and those are the ones that the Illinois Collaboration on Youth case articulates, which are situations in which the Constitution itself mandates funding. Judicial salaries are the classic example. In a taking clause where the government takes property, the Constitution says the state has to pay for it. Those are constitutional obligations to spend money that are an exception to the general prohibition against making the state a defendant where it would be required to spend money, or making a state officer a defendant where there would be a requirement to spend money. But the governor's role with respect to appropriations is minimal. If the legislature decides to ignore his budget, they can ignore his budget. There's no obligation by them to consider it at all. And, in fact, in recent years, we've seen situations where the governor's office and the legislature are like ships passing through the night on the legislative appropriation process. Ultimately, the core question in this case, if you get past the jurisdictional and justiciability issues, is what branch of state government has the constitutional responsibility to determine what level of state money to spend on public education? The defendants say it's the legislature. And the plaintiffs say, well, it's really the courts. Or if it's not the courts, the legislature has passed the responsibility on to the courts, not by appropriating money, the constitutionally prescribed method for spending state funds, not by enacting an appropriation for state spending, but by declaring that they have a plan which, if followed with future appropriations necessarily, would achieve a certain level of educational support. But it is not the legislature's prerogative to shift off to anybody else that core responsibility where they're accountable to the electorate to determine how much of the limited resources that the taxpayers provide are going to be spent for public education or for any other purpose. They cannot pass the buck. The buck stops with the legislature. And that is what the court in the Edgar case essentially said. It's true that the Edgar case pointed out that it's not the court's function to determine what a high-quality education is. But it's not just the legislature's responsibility to define what a high-quality education is. In the structure of our constitution, it is their responsibility to determine how much shall be spent for public education. And I'll say there's one thing that's not in dispute here, and that is historically that there has been a marked disparity in the revenues available to different local schools in this state, and that some schools have gotten much more money through the local property tax system than other schools that have less property value and are less affluent. And that despite those disparities, the state has not done what a lot of people think should be done in terms of providing the revenues necessary for the less affluent and less privileged schools to provide a good education for their students. But that is inherently a political question. It is one that the Constitution vests in the General Assembly to resolve. And they have taken positive steps in that direction. They have passed this new formula, Section 18-8.15 of the school code, that establishes a formula under which essentially all new funds go to the least-advantaged schools in this state. And 99% go to the bottom 50%, and 99 hundredths of the next 1% go to the next quartile. The top schools in the state get 0.01% or something like that of all new funding that's supplied. What else has the legislature done? They have increased state funding for public schools under this formula by a third of a billion dollars a year. Now, when we have a $40 billion-a-year state operating budget for general funds, that's a lot of money. And I'm hopeful that the legislature will be able to continue that trajectory and keep on providing that money for these schools. But I think addressing the question that Justice Welch asked, is there a linear relationship between state spending or local total educational spending and academic achievement? I don't think that that was alleged. I don't think that there's any evidence on it. Maybe there's sociological evidence that goes both ways. It's sort of like, does money translate into happiness equation? If you're poor, you're probably not going to be happy, but at some point, more money doesn't necessarily make you more happy. I don't know the answer to that, but I know that it's a question that the Constitution has charged the legislature with the exclusive, non-delegable responsibility to decide. They are doing that, they are doing that in a constructive way, and the plaintiff's theory is no good deed goes unpunished. So my first point on the merits of the public education clause is that the legislature could not, even if it tried to, delegate that responsibility to the State Board of Education or to the courts or anybody else. They have to decide how much money to spend on public education, and they have to do so through the appropriations process, not sideways by some resolution or statutory authority to somebody else to declare something as to how much should be spent. And second, that even if they could delegate that responsibility to somebody else, they haven't done so, and they haven't done so by giving the State Board of Education the authority to adopt academic learning standards. The plaintiffs confuse academic goals with appropriations for school funding. The two are not the same. The state is entitled to say, these are the standards that we'd like students to achieve in their academic progress in the public schools, but that doesn't mean somehow that they've given up their or that they intended to give up their responsibility to decide how much of state revenues to contribute to local public schools. Nor in this formula under Section 18-8.15 of the school code did they intend by any means to delegate to anybody else, including the courts, the responsibility to determine how to achieve the spending goals that make clear other aspirational objectives. In fact, the statute itself made it clear that what they intend to do is to try and meet that trajectory of increasing spending by over $300 million a year that goes into this formula that goes 99% to the poorest school districts in the state. So even if the legislature did have the ability to push off to anybody else the ultimate responsibility to determine how much to spend on public education, the facts don't show that they've done that. Either by giving the State Board of Education the authority to promulgate learning standards, which they've done, academic goals, nor by passing this spending formula that applies to whatever appropriations the legislature needs. Remember, in 1970, our Constitution shifted from a scheme in which the appropriation function, which belonged to the legislature, could be exercised in the same bill as substantive law. Now the 1970 Constitution says, now appropriation bills are limited to the subject of appropriation, which means that substantive law has to be in a separate bill and a substantive law can't require an appropriation. That has to be the subject of a separate appropriation process. So what I'd like the court to do is to understand that the constitutional framework that the Supreme Court recognized in the Edgar case has not changed, and that the legislature, in recognition of its responsibility, not judicially enforceable obligation, but the responsibility to decide how much to spend on public education, has done the right thing after many years of hardship. Everybody here, I think, remembers what happens to state revenues after the Great Recession. They went down for the big time, for the first time in decades. And in the aftermath of that, the public said, this isn't going to work, we've got to do something here, and our legislature increased our state taxes on all residents and all businesses in the state to try and meet the social service needs and other needs that the state has. Those taxes are coming out of our pockets, and one of the reasons that people supported that, and the legislature voted for that as hard as that is, is to help support local public education in the state, which is one of the... Let me ask you about the adoption of the learning standards. In the Lewis and Spagnola case, the Supreme Court emphasized that the courts do not have a way to measure quality. How do the adoption of learning standards affect how we analyze quality? This is a complicated process. We have expert educators in this room, and they'd probably be better able to answer that as a pedagogical matter, but as a legal matter, I think what that means is that although the State Board of Education can set academic standards and goals for students to meet, and protocols and teaching methods and strategies and requirements for schools to provide, that that itself does not equate with the constitutional provision that refers to the state providing an efficient system of high-quality public educational institutions and services. The academic standards for the students is separate from the institutions themselves that should provide them. And so the State Board of Education saying, this is the level of competency we want fourth graders to have in math, doesn't easily translate into the type of institution, much less the financing for that institution, that the Constitution refers to. And again, that case and other precedent has said that the responsibility to determine how to do that is a legislative function. Well, in Edgar, the court emphasized that the local control was an important rational basis for the disparities in funding. Now that learning standards have been adopted, does that tend away from local control? To a certain extent, it absolutely does. It seems to me it would undermine that argument. Pardon me? It seems to me it would undermine that rationale. I don't think it undermines it. I think that it's a false choice to assume that either there is local control or there's no local control. And if there's no local control, then to leave with the legislature the function of deciding what funding should go on for public schools generally based upon a premise of local control becomes irrational. Remember, the rational basis test is the lowest level of judicial scrutiny for this thing. So it's not a black or white set of options. It's not as if there's either no local control or complete local control. There's always some local control, and I think that's one of the hallmarks of the educational system in the state, which is preserved, notwithstanding the efforts that the state has made to set some academic standards and to provide additional funds. And that is that different school districts can decide to have art programs or to have foreign language programs or to emphasize more extracurricular sports activities. That local control doesn't go away, and parents are very much invested in the idea of being able to participate in that type of local control. So even though there may be benchmarks for learning standards for math and for science and for language at different grade levels that the State Board of Education has prescribed with legislative authority, that doesn't take local control away to the point that it's not existent and can't support the rational basis that the court in Edgar said justified, not requiring the state to take over school funding entirely. And I do want to mention that the authority of the State Board of Education, by statute, includes recommending state funding, but not prescribing state funding. So there's nothing that they could do that would be able to force the state to achieve a level of state funding, including by prescribing these academic standards. If I may, I'd like to respond to some of the comments of opposing counsel here. With respect to the remedies, he has moved the goalpost away from what their complaint asked for in terms of $7 billion a year in extra funding without explaining where that would come from, what other state spending would be displaced or would we just add to the budget by $7 billion a year. Then they shifted this 10-year schedule of additional funding, again, court-enforced without explaining where the money would come from or how that doesn't interfere with the legislative process of making appropriations, which the Constitution prescribes. And now they're in the realm of asking the court to adopt what they call a declaratory or issue a declaratory judgment. But a declaratory judgment is designed to identify for the parties what their legal obligations are that then become enforceable if there's noncompliance with those obligations. Here they're asking for the courts to declare an abstract matter of principle where there is no underlying obligation that could be the subject of coercive relief later if there were noncompliance with it. And the whole idea of the court trying to backseat drive or micromanage the governor's process and promulgating a budget is one that I think should cause the court to have great reserve or reservation about doing that, especially when the ultimate authority to decide what state spending for public education and for other purposes is vested exclusively in the legislature. On the standing issue, I think, you know, he relies upon cases that he says implicitly adopt some theory of standing that supports him. Precedent is either a decision on a point that's argued and decided or it's not precedent. And that's well-established law of stare decisis. And these cases that don't address these standing issues and don't decide them, they're not precedent either way. I would comment that there is a citation to an unpublished decision by this court in opposing counsel's brief notwithstanding the clear prohibition on doing so in Rule 213. I hope the court will not just disregard that but admonish any counsel who purports to violate that rule and cite a case like that for precedent when that is absolutely prohibitive. That's a portion I just skipped right off. Yeah, but I see counsel doing this more and more because the courts are essentially turning a blind eye to it instead of saying, you know, as the Fourth Circuit or the Fourth District did a number of years ago, you're not allowed to do this and don't ever do it again. There is a difference between rights and interests. And in Illinois, you can enforce your own rights. You can't simply get into court and enforce somebody else's right because you have an interest in it. That's like the person who sells tomatoes to the grocery store who wants to sue the landlord for terminating the grocery store's lease on breach of contract theory. Maybe you're not going to be able to sell tomatoes to the retailer, but that doesn't give you standing to go in and sue for breach of contract because it's not your contract. These rights belong to the students, not to the school districts. And they are not representatives of the students. Their status as in loco parentis with respect to various matters that go on in the schools doesn't give them representational standing to represent those students in the courts. Well, then who represents the students? Their parents can. Absolutely. And how do the parents collectively represent themselves? One parent would be enough. If one student had a right whose constitutional rights were violated, that student's parent would be able to bring suits to enforce those rights on behalf of the child's student. So you wouldn't have any, basically, objection to not only put words in your mouth, but it would be more proper then to have at least one parent join into this lawsuit. Absolutely. Here there is not a single student or parent of a student in these school districts that's a plaintiff. And to allow strangers to appear and represent those rights without any basis recognized by the courts for them to do so would be a bridge too far. Thank you so much, Your Honors. Thank you, Justice. Your Honor. You are aware of the unpublished rule, the U.C.U. I believe the case is Clark, and we were responding to a citation of it in the brief of the Attorney General. But I am aware of it. So if we violated it, my apology to the Court. Our learning council, my colleague here, is frustrated that it didn't draft the complaint itself because it would have drafted a complaint that seeks an order for appropriation from the General Assembly. We didn't seek that. There is no peripheral that seeks an order for appropriation from the General Assembly. And in the abstract, we agree in the abstract that the General Assembly can control whatever it wants in terms of appropriations. It has that power. That's not our case. Our case is that while the General Assembly has power to appropriate or not appropriate, the General Assembly does not have power to come in and impose these performance standards on children and punish them or sanction them, first by branding them as failures, but also by limiting their ability to go on with secondary education. They don't have the authority to do that unless they're going to fund it. You can't put students in this position. You can't deny their equal protection rights. Really, it's a due process, a substantive due process right. Our case is not just that there's an abstract duty to high-quality education and the General Assembly has to fund it. That's not our case. Our case is that these students have an entitlement to be able to meet the performance standards. And it's quite true that funding these districts and giving them adequate capacity does not necessarily guarantee that each student will pass. That won't happen. Even at Wilmette, not each student passes, and Wilmette has just a giant amount of money. There's real life. All sorts of things can determine whether or not a student achieves it. But the student has a constitutional entitlement, notwithstanding all the other budget problems of the state, to meet performance standards and meet them, have a reasonable opportunity, not a guarantee, but a reasonable opportunity. And the state of Illinois, in adopting the 2017 Act, said that unless these districts have the capacity to provide high-quality educational services, these students are unfairly disadvantaged. So it's not that we're coming in here and asking for any appropriation. We're not. We're asking that as long as these performance standards are in place, the state has an obligation to make sure that these students have a reasonable opportunity to make them. And there were a lot of points that counsel made that I take strong disagreement with. But I want to close by reading the words of the Declaratory Judgment Act, that the court may, in case of actual controversy, and we certainly have a controversy here, may make binding declaration of rights, and we're talking about a right to have a reasonable opportunity to meet the performance standards, having the force of final judgment. Whether or not any consequential relief is or could be claimed, whether or not we can get an appropriation from the General Assembly or not, we are entitled to a declaration. These children are entitled to a declaration. The districts are entitled to a declaration of rights. It's not our fault if we aren't meeting these standards when the General Assembly isn't funding them. That's what we're seeking, not an order of appropriation. About 90 percent of or 90 percent, two-thirds of the oral argument, I thought, of counsel is just off the point. We're not asking for appropriation from the General Assembly. We're asking for a declaration of a right to a reasonable opportunity to meet the learning standards and to meet the performance standards because we suffer consequences. And we're entitled to that relief whether or not the court can order any further relief. It's very important to have that vindication of the right. And in terms of the governor's role in the budget, we're not asking to control the governor's veto, and this isn't like the collaboration of youth case. We're referring to 15 ILCS 20-50-5, governor to submit state budget. It's going to happen in February. And guess what he has to submit a budget about? Education. So all we're saying is, look, when you're performing that role, which isn't a legislative function, you're not engaged in vetoing or actually making appropriation. All you're doing is sending over a request. When you're sending over a request under this statute, which is not a constitutional part of the legislative process, but a statute, you should have a plan as to how you're going to meet the goal. That's what we're asking for. Thank you.